**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Dale E. BIRDSELL, Defendant-Appellant.**

**No. 85–1133.**

United States Court of Appeals, Fifth Circuit.

Nov. 1, 1985.

Rehearing Denied Dec. 9, 1985.

Jody L. McPherson, Dallas, Tex., (Court-Appointed), for defendant-appellant.

James A. Rolfe, U.S. Atty., Jack A. Williamson, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before RUBIN, JOHNSON and JONES, Circuit Judges.

EDITH HOLLAN JONES, Circuit Judge:

The appellant, Dale E. Birdsell, appeals his jury conviction of one county of conspiracy and two substantive counts of transporting in interstate commerce counterfeit securities and the tools and implements used to forge them. *See* 18 U.S.C. §§ 2, 371, and 2314. Birdsell raises three principal issues on appeal: (1) that the district court judge erred in finding him competent to stand trial; (2) that his trial was fundamentally unfair; and (3) that the district court's instruction on insanity was incorrect. Finding Birdsell's arguments meritless, we AFFIRM the judgment of the district court.

The conspiracy charged in Count 1 of the indictment began in early 1982 when Birdsell picked up Mark Hosie, an illegal alien who was hitchhiking in Miami, Florida. After learning of Hosie's illegal status, Birdsell provided Hosie with a false birth certificate. Birdsell obtained false birth certificates by researching obituaries in libraries and then applying for duplicate birth certificates with the information obtained from his research. Birdsell explained to Hosie that he made counterfeit cashier's checks and used the birth certificates to obtain false identification with which to cash the checks. Birdsell asked Hosie to help him in his scheme and offered Hosie fifty percent of the profits. Hosie agreed and the two eventually forged and passed counterfeit cashier's checks in Texas, Florida, New Mexico, Oregon, Califor-

nia, and Mississippi. At one point, Birdsell told Hosie that the face value of the cashier's checks that they had forged was probably in excess of $1,000,000. In early September 1983, Hosie was arrested. He pleaded guilty to two counts of passing counterfeit cashier's checks and agreed to cooperate with the Secret Service. At the time he testified, Hosie was serving five years in the Fort Worth Correctional Institute as a result of his plea bargain.

After Hosie's arrest, Birdsell continued his fraudulent activities. In December 1983, Birdsell acquired a new accomplice, Clyde W. Cates, Jr., who traveled with him until their arrest in February of 1984. Birdsell was indicted and charged with conspiring with Hosie to transport in interstate commerce counterfeit securities and the tools used to forge them. Birdsell then filed his motion of intent to assert the insanity defense. On the government's motion, Birdsell was ordered transferred to the United States Medical Center for Federal Prisoners at Springfield, Missouri, for psychiatric examination to determine (1) whether he was competent to stand trial and (2) whether he had suffered from a mental disease or defect during the period of the alleged conspiracy. Medical Center personnel concluded that Birdsell was competent to stand trial and a trial date was set. Birdsell then moved for a hearing to determine his competency to stand trial. See 18 U.S.C. § 4241(a) (formerly § 4244).

After hearing expert and lay testimony from government and defense witnesses, the trial judge concluded that Birdsell was competent to stand trial. See 18 U.S.C. § 4241(d). An order memorializing that finding was filed at the completion of the trial. Following trial, the jury found Birdsell guilty on all three counts, and Birdsell was sentenced to consecutive prison terms totaling 25 years. Birdsell filed a timely notice of appeal.

## Competency Hearing

The federal standard for determining competency to stand trial prohibits trial if the court finds, by a preponderance of the evidence, that "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court held that the trial judge must determine whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *See also United States v. Hayes*, 589 F.2d 811, 822 (5th Cir.), *cert. denied*, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *United States v. Makris*, 535 F.2d 899, 907 (5th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977). "A district court's determination of competency to stand trial may not be set aside on review unless it is clearly arbitrary or unwarranted." *Hayes*, 589 F.2d at 822.

In determining whether the district court's finding is clearly arbitrary or unwarranted, this Court must remember that the question of competency is a mixed question of law and fact which has direct constitutional implications. *Makris*, 535 F.2d at 907. Thus, while not undertaking a *de novo* review, this Court must re-analyze the facts and "take a hard look at the trial judge's ultimate conclusion." *Id.*

Birdsell asserts that he is the reincarnation of Confederate General Nathan Bedford Forrest, who, born in 1821, was the first Imperial Wizard of the Ku Klux Klan.[1] Birdsell allegedly commits his criminal activity because he is under instruction to forage for "the cause." Birdsell also allegedly believes that, when he dies, his

---

1. Birdsell relied on this assertion as the basis for an unsuccessful insanity defense as long ago as 1965. *See Birdsell v. United States*, 346 F.2d 775 (5th Cir.), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965).

spirit will return to earth as a person named Brandt, who is also a relative of General Forrest.

In challenging the district court's ultimate finding of competency, Birdsell raises four specific issues. First, Birdsell argues that the district court's finding was clearly arbitrary and erroneous because the court appeared to rely solely on the testimony of Dr. Echols, a relatively inexperienced psychologist, while generally disregarding "the highly credible testimony of Dr. Griffith, a forensic [psychiatrist] with 25 years experience in private practice." This assertion is contrary to fact and, accordingly, we reject it.

Dr. Clay Griffith testified on behalf of the defense. Dr. Griffith has a subspecialty in "forensic" or "legal" psychiatry and, in his 25 years of practice, has examined approximately 15,000 people, 6,500 of whom had been charged with felonies. Dr. Griffith examined Birdsell on three occasions for a total of five and one-half hours. As a result of his examinations, Dr. Griffith concluded that Birdsell had a severe mental illness, specifically schizophrenia, paranoid type, very active and grandiose.

In support of his conclusion, Dr. Griffith noted that Birdsell had a "flatness" in emotional reaction. According to Dr. Griffith, this is a sign of mental illness of some type which is not easily mimicked or duplicated by someone who is not mentally ill. Birdsell was very talkative during their meetings, but Dr. Griffith noted that more than fifty percent of the conversation consisted of delusional thinking or "rambling." Dr. Griffith also noted that Birdsell was experiencing auditorial hallucinations and "blocking," a type of impairment of mental or thought processes which hindered Birdsell's ability to aid his attorney. It was his further opinion that Birdsell was psychotic and that he was not lying, faking or distorting the extent of his mental capacity. Dr. Griffith's ultimate conclusion was that Birdsell did not have the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and that Birdsell did not have a

rational as well as factual understanding of the proceedings against him and, thus, was not competent to stand trial. Dr. Griffith's opinion regarding Birdsell's mental state did not change as a result of his later examinations of the defendant.

Dr. Griffith based his initial diagnosis solely upon his first interview with Birdsell. After his initial interview, Dr. Griffith reviewed previous psychiatric reports and discovered diagnoses in 1969, 1974, and 1979 that were consistent with his diagnosis. Thus, Dr. Griffith concluded that Birdsell's mental condition had been consistent for the past 20 years.

Under examination by the court, Dr. Griffith admitted that Birdsell's delusional state was coexistent with Birdsell's record of criminal activity. Dr. Griffith added, however, that the reason Birdsell's delusional state might appear to coincide with his criminal activity was that Birdsell was only diagnosed and treated after he was arrested. Dr. Griffith further admitted that there are many people who suffer delusions but never enter into criminal activity and, further, that Birdsell's criminal activity could be completely independent from his delusional thinking. Dr. Griffith did not think that Birdsell's mental impairment would preclude him from carrying out the rather complicated criminal scheme of counterfeiting and cashing cashier's checks.

The government, in asserting that Birdsell was competent to stand trial, presented the testimony of one lay witness and two experts. One of the government's expert witnesses was Dr. Christina S. Echols, a clinical psychologist at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri. Dr. Echols received her Ph.D. in clinical psychology in February of 1983 and, at the time of trial, had been employed at the Medical Center as a forensic psychologist for approximately eighteen months. Dr. Echols personally interviewed Birdsell on four different occasions and spent a total of four hours with him. She caused Birdsell to take a series of tests, including a Competency Screening Test. This test

measured Birdsell's knowledge of courtroom proceedings. The two page questionnaire contained incomplete sentences which Birdsell was required to finish. Dr. Echols found that most of Birdsell's answers were logical and intelligent.

During Dr. Echols' meetings with Birdsell, he told her that he was charged with counterfeiting securities. Dr. Echols also became aware that Birdsell frequently visited the law library and that other prisoners sought him out for legal advice. Based on her personal contacts, and after reading the progress reports made by other members of the staff during Birdsell's 90-day stay at the Medical Center, it was Dr. Echols' opinion that Birdsell had a factual and rational understanding of what he was charged with and that he could assist his attorney in preparing his defense.

Under cross-examination, Dr. Echols admitted that she did have some questions about Birdsell's psychiatric history. Specifically, she noted that there were discrepancies over the past 20 years and that, in her opinion, it was "highly unusual" that Birdsell's psychiatric history was based almost entirely on forensic evaluation. It was also unusual, in her opinion, that Birdsell had been diagnosed as having the same condition for the past 20 years. Even though she knew that approximately · 20 psychiatrists had examined Birdsell in the past and had taken their reports into account, she still concluded that Birdsell was faking or malingering. The mere fact that Birdsell repeated the same thing to 20 doctors did not, in her opinion, make a delusional thinking diagnosis more reliable. Furthermore, even though she felt that Birdsell was faking or malingering, she did recognize that Birdsell exhibited the paranoid characteristics associated with a personality disorder. A personality disorder, however, is very different from paranoid schizophrenia and she did not believe that Birdsell suffered from that psychosis or any other major mental illness.

Dr. Echols's testimony was substantially corroborated by that of Dr. James R. Markette, a staff psychiatrist in the Sky View Maximum Security Unit at Rusk State Hospital. At the time of trial, Dr. Markette had been a psychiatrist for approximately 20 years and had been at Rusk for about 4 years. Birdsell was committed to the Rusk State Hospital from March 9 through June 13, 1984, for psychiatric evaluation. Dr. Markette conducted two personal interviews with Birdsell of approximately 1 hour each and also saw him on a weekly basis over a 90-day period. After his initial intake interview with Birdsell, Dr. Markette felt that Birdsell was competent to stand trial. After further contact during Birdsell's stay at the hospital, Dr. Markette found Birdsell to be literate, articulate, communicative, self-resourceful, and helpful and considerate of the older, less mobile patients. Dr. Markette's diagnosis was similar to that of Dr. Echols. Specifically, Dr. Markette determined that Birdsell was suffering from a personality disorder of the paranoid type but that he was competent to stand trial.

The Government's lay witness was Mark Hosie. Hosie's testimony substantially confirmed the expert testimony that Birdsell was competent to stand trial. Hosie traveled with Birdsell for approximately one and one-half years. During their travels, Birdsell told Hosie that he had previously "beaten" the prosecution by pleading insanity and advised Hosie to try such a scheme should he ever be arrested. Birdsell told Hosie to tell the authorities that he had "delusions of grandeur" by saying that he had an invisible friend who sat on his shoulder or that he was descended from royalty. Hosie testified that he and Birdsell had several conversations along these lines. Hosie further testified that after he was arrested, Birdsell called him on the telephone while he was in jail. He told Birdsell that he was trying to plead insanity by saying that he was the "hereditary king of the planet Malner." Birdsell told him that he was "on the right track" and that he should pursue the defense.

■ The district court's finding that Birdsell was competent to stand trial is not clearly arbitrary or unwarranted. The

court obviously credited the testimony of the government witnesses over that of the defense. The government witnesses both had the opportunity to observe Birdsell over a three-month period. In addition to the information they gathered during their personal contact with Birdsell, the government experts also had the benefit of a vast amount of data gathered by all the support personnel at the Medical Center and the Rusk State Hospital. It appears eminently reasonable that the district court would rely on the observations of those witnesses in long-term daily contact with the patient rather than conclusions based on a relatively brief period of examination. Furthermore, the district judge did not "disregard" the testimony of Dr. Griffith. Quite to the contrary, the judge acknowledged Dr. Griffith's expertise but stated that he simply disagreed with the doctor's opinion in this case. This was the function of the trial court:

> In the final analysis, the determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings against him.

*Makris,* 535 F.2d at 908. The district court also had the benefit of Hosie's testimony that Birdsell told him on numerous occasions that he had beaten the prosecution by pleading insanity and had explained to Hosie the exact manner in which he had accomplished this. *See Id. See also U.S. v. Gray,* 421 F.2d 316, 318 (5th Cir.1970).

■ Birdsell also argues that the district judge improperly assumed that he had never been imprisoned, hospitalized, or medicated as evidence that the judge's findings were based on incorrect facts. While the court order finding Birdsell competent to stand trial does mention the fact that Bird-

sell apparently never received treatment or medication for his alleged illness, the statements are made in the context that they are the opinions of Drs. Echols and Markette.[2] Furthermore, the record does not indicate that the judge based his findings on these allegedly false assumptions or that he mentioned these facts for any purposes other than illustration.

■ Birdsell next points to aspects of Dr. Echols' testimony and argues that it was incomplete or simply wrong. Dr. Echols, however, was subject to extensive cross-examination by Birdsell's counsel and, thus, the court was fully apprised of those areas where there were conflicts in testimony. In those aspects of her testimony on which she was not cross-examined, Birdsell has apparently improperly assumed that it was the function of the trial court, rather than his defense counsel, to serve as his advocate.

■ Finally, Birdsell argues that the court should have personally examined him. The court did engage in examination of Birdsell's expert witnesses. Birdsell, however, never took the stand and, thus, the court had no opportunity to question him directly.

*Fair and Impartial Trial*

Birdsell next argues that there were five specific improprieties during trial which rendered his trial fundamentally unfair. With respect to each asserted error, the record reflects that no objection was made by defense counsel. Accordingly, our review of the alleged errors is limited to plain error. *United States v. Reeves,* 752 F.2d 995, 1000 (5th Cir.), *cert. denied,* ___ U.S. ___, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985); *U.S. v. Ramirez-Preciado,* 747 F.2d 273, 276 (5th Cir.1984). Under this standard, Birdsell must demonstrate that each alleged impropriety was " 'so clearly erroneous as to result in a likelihood of a grave miscar-

---

**2.** The district court's order indicates that Dr. Leach testified at the competency hearing. In fact, Dr. Markette testified at the competency hearing while both Drs. Markette and Leach testified at trial. Both Drs. Markette and Leach

examined Birdsell over a three-month period and both reached the conclusion that Birdsell was competent to stand trial. Thus, it appears that the trial court merely confused the names of the examining psychiatrists.

riage of justice.'" *United States v. Eiland,* 741 F.2d 738, 743 (5th Cir.1984) (quoting *United States v. Varkonyi,* 645 F.2d 453, 460 (5th Cir.1981)).

■ Birdsell first asserts that he was prejudiced by being forced to appear at voir dire, jury selection, and the first afternoon of trial unshaven and in prison clothing. This Court, in *Hernandez v. Beto,* 443 F.2d 634, 636–37 (5th Cir.), *cert. denied,* 404 U.S. 897, 92 S.Ct. 201, 30 L.Ed.2d 174 (1971), determined that trying a defendant in prison clothing infringes his fundamental right to the presumption of innocence. That right is only infringed, however, when a state *compels* an accused to stand trial before a jury while dressed in identifiable prison garb. *Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 1696, 48 L.Ed.2d 126 (1976). If, for whatever reason, the defendant fails to object to his attire, the presence of compulsion necessary to establish a constitutional violation is negated. *Id.* at 512–13, 96 S.Ct. at 1696–97. Accordingly, a "defendant may not remain silent and willingly go to trial in prison garb and thereafter claim error." *Hernandez v. Beto,* 443 F.2d at 637.

In this case, Birdsell was not in prison garb during the entire trial. He wore prison clothing only during voir dire, jury selection and the first afternoon of trial. Furthermore, Birdsell has presented no evidence from which this Court could conclude that he was compelled to wear this clothing. Indeed, in view of Birdsell's complete reliance on the insanity defense, it is not entirely clear that his presence in prison garb during the voir dire and jury selection was not a defense tactic. *See, e.g., Estelle v. Williams,* 425 U.S. at 508, 96 S.Ct. at 1695. In any event, the failure to object negates the presence of compulsion and, thus, there was no plain error. *See also Gray v. Estelle,* 538 F.2d 1190, 1190–91 (5th Cir.1976).

■ Birdsell next asserts that the trial court's voir dire was inadequate to discover any underlying prejudice the venire may have had toward the insanity defense. Pursuant to Fed.R.Crim.P. 24(a), "the trial judge is vested with broad discretion in the conduct of voir dire, and absent an abuse of discretion and a showing that the rights of the accused have been prejudiced thereby, the scope and content of voir dire will not be disturbed on appeal." *United States v. Black,* 685 F.2d 132, 134 (5th Cir.), *cert. denied,* 459 U.S. 1021, 103 S.Ct. 387, 74 L.Ed.2d 518 (1982). *See also United States v. Apodaca,* 666 F.2d 89, 94 (5th Cir.), *cert. denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 58 (1982) ("The judge has broad discretion in the conduct of the voir dire, subject to the essential demands of fairness that require that prejudice would be discovered if present").

Birdsell's counsel did not submit voir dire questions on the insanity defense as permitted under Fed.R.Crim.P. 24(a). At voir dire, the court questioned the jury as follows:

> THE COURT: Ladies and gentlemen, you will hear evidence, when we commence the testimony, as to the mental condition of the Defendant, both at the present time and at the time of the alleged commission of these offenses.
>
> Is there anyone on the jury panel that has had any experience involving mental illness that would cause you to be other than fair and impartial on that issue if it's presented to you? In other words, could you decide that issue of sanity or insanity based on the evidence you hear and not be influenced on any outside experiences you may have had? All right. I take it by the lack of hands that you can.

Defense counsel did not object to the form of the question or argue that further questioning would be appropriate. The panel was questioned as to whether the insanity defense could be fairly decided by them and Birdsell has not shown any plain error in the failure to question the venire further.

■ Birdsell also asserts that the district court failed to safeguard the impartiality of the jury when it failed to ascertain whether the jury had read or been influenced by an allegedly prejudicial article which appeared

in a local newspaper on the second day of trial. The record reflects that defense counsel never raised the issue of prejudicial trial publicity. In introductory instructions, the court cautioned the jury that they must "not consider anything [they] may have read or heard about the case outside of the courtroom whether before or during the trial." Birdsell has alleged no facts from which this Court could conclude that any of the jury members even read the article. Accordingly, he has shown no plain error in the trial court's failure to question the jurors about the newspaper article.

■ Birdsell next objects to the admission of the testimony of six witnesses relating to Birdsell's cashing of counterfeit cashier's checks in November of 1983, two months after Hosie had been arrested. The indictment charged a conspiracy that lasted until January 1984. The arrest of Hosie in September of 1983 did not necessarily put an end to the conspiracy. It is clear that Birdsell remained fully capable of carrying out the purpose of the conspiracy. *See, e.g., United States v. DeLeon,* 641 F.2d 330, 334 (5th Cir.1981). In any event, the testimony clearly illustrated the method which Hosie testified was used by Hosie and Birdsell to cash the counterfeit cashier's checks and, thus, was merely cumulative, not prejudicial. It was not plain error for the district court to fail to exclude it. *See, e.g., United States v. LaCoste,* 721 F.2d 984, 987 (5th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

Birdsell's final contention is that he was prejudiced by improper remarks of the prosecutor during closing arguments. Birdsell's counsel made no contemporaneous objection to two of these allegedly improper remarks and, thus, with respect to these portions of the closing argument, Birdsell is "entitled to relief only if the statements were so prejudicial as to constitute plain error." *United States v. Nichols,* 750 F.2d 1260, 1264 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985). Plain error in this instance must be obvious, substantial, and so basic and preju-

dicial that the resulting trial lacks the fundamental elements of justice. *Id.*

■ Birdsell asserts that three specific portions of the prosecutor's closing argument were prejudicial. First, Birdsell argues that the prosecutor expressed his personal opinion of Dr. Griffith and that this was blatantly improper. The prosecutor stated:

Ladies and gentlemen, [defense counsel] didn't think it was right that Dr. Echols and Dr. Leach laughed at Mr.—doctor—I guess I'm not sure whether it's Dr. Griffith or Mr. Griffith. I think everybody should laugh at his testimony. . . . I think we should all laugh at that kind of job and I think you can conclude from that a lot of other people examined Birdsell did the same thing.

The prosecutor's remarks were an invited response to defense counsel's statement that both Dr. Echols and Dr. Leach laughed at Dr. Griffith's medical conclusions. The prosecutor's response, taken in context, does not give his personal opinion of Dr. Griffith's testimony or credibility but, in fact, merely suggests a conclusion that the jury might draw as to Dr. Griffith's credibility. The prosecutor's remarks as to Dr. Griffith's statement that, out of 15,000 patients, he did not believe that he had ever arrived at an incorrect diagnosis, was also not improper. Again, the prosecutor appears to be merely suggesting to the jury conclusions that it could draw from this evidence as to the doctor's credibility. Accordingly, the prosecutor's remarks did not unfairly prejudice Birdsell or render his trial fundamentally unfair. *See, e.g., United States v. Bryant,* 770 F.2d 1283, 1291–92 (5th Cir.1985); *United States v. Garza,* 608 F.2d 659, 662–63 (5th Cir.1979).

■ Birdsell next asserts that the prosecutor's remarks with regard to the number of counterfeit cashier's checks were intended to imply the existence of unadmitted evidence of his guilt and, thus, were prejudicial and highly improper. The prosecutor, in closing, referred to Hosie's testimony that Birdsell told him that they had

probably passed $1,000,000 in counterfeit cashier's checks:

> [Defense counsel] would have us sit here for 3 or 4 weeks so we can put into evidence more cashier's checks. We've got enough of these already. We don't need to sit here 3 or 4 more weeks and dump in tons more of these counterfeit cashier's checks that have been passed. You've seen enough, probably too much.

At this point, defense counsel objected that the prosecutor was arguing facts not in evidence. Without ruling on the objection, the court cautioned the jury "to base their verdict on the evidence that was adduced before them and not to take what the lawyers say as evidence." Hosie did testify at trial that Birdsell admitted to him that they had probably passed in excess of $1,000,000 in counterfeit cashier's checks. While this testimony was uncorroborated, the jury was free to believe Hosie if they found him to be a credible witness. In light of this evidence and the court's cautionary instruction, the prosecutor's remarks did not amount to reversible error.

■ Birdsell finally argues that the prosecutor implied, in his statements to the jury, that if they acquitted Birdsell by reason of insanity, he would go free. The prosecutor argued:

> It's time to put an end to Mr. Birdsell's career, his profession as a criminal that he's carried on and it's time to stop his travels throughout the United States. It's time to stop his travels and his passing of these counterfeit cashier's checks, his stealing of hundreds of thousands of dollars from merchandise [sic] all over the country including here in Texas. . . .
>
> \* \* \* \* \* \*
>
> . . . . It's time here today . . . to say, no, Mr. Birdsell your time has stopped, your travels stopped [sic], your games stopped [sic], your manufacturing of counterfeit checks stops. It's over with now finally for once and for all. And the reason it's over with is because this time

Mr. Birdsell didn't pull off his acting game too well. . . . He can't keep this act up for 90 days and he didn't. He couldn't begin to. . . .

> \* \* \* \* \* \*
>
> . . . . It's time to go back and return a guilty verdict against Mr. Birdsell and say to Mr. Birdsell stop at a million dollars, doesn't go any further [sic].

Defense counsel did not object to the prosecutor's comments and this Court cannot find that the remarks were improper. Unlike *U.S. v. Williams*, 523 F.2d 1203 (5th Cir.1975), upon which Birdsell relies, the prosecutor here did not imply that if the jury did not convict Mr. Birdsell but found him not guilty by reason of insanity, that Birdsell would leave the courtroom to commit other crimes.

■ Birdsell nonetheless argues that even if the alleged improprieties, considered in isolation, did not amount to such prejudice as would render his trial fundamentally unfair, that the combination of errors, when considered as a whole, denied him a fair and impartial trial. Because none of these alleged improprieties has been found to be prejudicial, their consideration in combination cannot change that conclusion.[3]

### Insanity Instruction

Birdsell's final argument is that the trial court's instruction on insanity was incorrect. No objection to this instruction appears in the record. "Where a defendant fails to object to a jury instruction at trial and raises the issue first on appeal, an appellate court will uphold even an inaccurate jury instruction provided no 'plain error' has resulted from the inaccuracy." *Reeves*, 752 F.2d at 1000.

The district court instructed the jury that:

> A person is insane within the meaning of these instructions, and is not responsible for criminal conduct if, at the time of such conduct, as a result of mental

---

**3.** Birdsell also argues that the prosecution, in posing hypothetical questions to his expert witness, mischaracterized the evidence. A thorough review of the hypothetical questions presented by the prosecution has not revealed any mischaracterization of the evidence.

disease or defect, he is unable to appreciate the wrongfulness of his conduct.

The terms means [sic] disease or defect do not include an abnormality manifested only by repeated criminal or other anti-social conduct.

This instruction is virtually identical to the definition of insanity this Court adopted in *United States v. Lyons,* 731 F.2d 243, 248 (5th Cir.) (en banc), *cert. denied,* ___ U.S. ___, 105 S.Ct. 323, 83 L.Ed.2d 260 (1984).

Birdsell first asks this panel to reconsider the insanity definition adopted in *Lyons.* *Lyons* was decided *en banc* and this panel is not empowered to reconsider the decision. Furthermore, effective October 12, 1984, the Insanity Defense Reform Act of 1984 adopted a definition of insanity which is virtually identical to the definition adopted by this Court *en banc* in *Lyons.* *See* 18 U.S.C. § 20(a). Accordingly, this definition of insanity is now federal law and cannot be rejected by this Court.

Birdsell also asserts as error the second paragraph of the insanity instruction as not authorized by *Lyons.* In *Blake v. U.S.,* 407 F.2d 908 (5th Cir.1969) (en banc), *modified U.S. v. Lyons,* 731 F.2d 243 (5th Cir.) (en banc), *cert. denied,* ___ U.S. ___, 105 S.Ct. 323, 83 L.Ed.2d 260 (1984), this Court adopted the A.L.I. Model Penal Code definition of insanity:

> "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
>
> "(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

*Id.,* 407 F.2d at 916. *Lyons* modified this definition only to the extent that the volitional prong of § 1 was eliminated. Accordingly, instructing the jury that the term "mental disease or defect" does not include an abnormality manifested only by repeated criminal conduct was not improper. Furthermore, since the evidence was overwhelming that if Birdsell's mental disease in fact existed, it had manifestations other than criminal conduct, the court's insanity instruction was not plain error.[4]

Judge Rubin concurs in this opinion, noting that he is bound by *Lyons,* as the law of the circuit, although he adheres to the views expressed in his dissent from that opinion.

Accordingly, Birdsell's conviction on all three counts of the indictment is AFFIRMED.

---

4. In his reply brief on appeal, Birdsell argues, for the first time, that he received ineffective assistance of counsel at his trial. Because the government has not had an opportunity to respond to this contention, we will not address the issue. *See Knighten v. C.I.R.,* 702 F.2d 59, 60 n. 1 (5th Cir.), *cert. denied,* 464 U.S. 897, 104 S.Ct. 249, 78 L.Ed.2d 237 (1983); *Beerly v. Department of Treasury,* 768 F.2d 942, 949 (7th Cir. 1985). In any event, the assertions of ineffectiveness encompass matters outside the record and, thus, may be appropriately raised pursuant to 28 U.S.C. § 2255. *See, e.g., United States v. Lauga,* 762 F.2d 1288, 1290–91 (5th Cir.), *cert. denied,* ___ U.S. ___, 106 S.Ct. 173, 88 L.Ed.2d 143 (1985).